No. 22-1958

# UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

JENNIFER ROOT BANNON, as the Special Personal
Representative of the Estate of Juston Root,

*Plaintiff-Appellant*,

v.

DAVID GODIN, Boston Police Officer;
JOSEPH McMENAMY, Boston Police Officer;
LEROY FERNANDES, Boston Police Officer;
BRENDA FIGUEROA, Boston Police Officer;
COREY THOMAS, Boston Police Officer;
PAUL CONNEELY, Massachusetts State Trooper;
THE CITY OF BOSTON,

*Defendants-Appellees*.

On Appeal From the United States District Court for the District of Massachusetts
in Case No. 1:20-cv-11501, Judge Richard G. Stearns

## PLAINTIFF-APPELLANT'S PETITION FOR REHEARING EN BANC

Dated:  May 6, 2024                    *Counsel Listed Inside Cover*

Mark A. Berthiaume
   First Circuit Bar No. 20513
Gary R. Greenberg
   First Circuit Bar No. 10957
Alison T. Holdway
   First Circuit Bar No. 1197650
GREENBERG TRAURIG, LLP
One International Place, Suite 2000
Boston, Massachusetts 02110
Telephone: 617.310.6000
Facsimile: 617.310.6001
Email: berthiaumem@gtlaw.com
Email: greenbergg@gtlaw.com
Email: alison.holdway@gtlaw.com

*Counsel for Plaintiff-Appellant Jennifer
Root Bannon*

# <u>TABLE OF CONTENTS</u>

Rule 35(b) Statement ................................................................................1

Background .................................................................................................2

    1.    Officers Shot Root at BWH. ..........................................................2

    2.    The Pursuit Was "as Slow as Molasses." .....................................3

    3.    Defendants Killed Root. .................................................................3

    4.    Root Was Not Holding the Plastic bb Gun. ..................................6

    5.    The BPD Defendants Met Together Before Being Interviewed. ..........6

Argument....................................................................................................7

    1.    The Majority Deviated from Summary Judgment Standards. ..............7

        A.    The Majority Failed to Apply Binding Precedent. ....................7

        B.    The Majority Disregarded Authoritative Decisions. ................14

    2.    The Majority Ignored Blackletter Fourth Amendment Law..............15

    3.    The Majority Decision Risks Future Fourth Amendment Violations. ..........................................................................................17

Conclusion ...............................................................................................18

Rule 32(g)(1) Certification ......................................................................21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..............................................................................8

*City of Escondido v. Emmons*,
586 U.S. 38 (2019)...............................................................................17

*Flythe v. District of Columbia*,
791 F.3d 13 (D.C. Cir. 2015)..........................................................14, 15

*Graham v. Connor*,
490 U.S. 386 (1989)..............................................................................15

*Griggs-Ryan v. Smith*,
904 F.2d 112 (1st Cir. 1990)...................................................................8

*Jarrett v. Town of Yarmouth*,
331 F.3d 140 (1st Cir. 2003)......................................................1, 16, 17

*Lachance v. Town of Charlton*,
990 F.3d 14 (1st Cir. 2021)..............................................1, 15, 16, 17

*Lamont v. New Jersey*,
637 F.3d 177 (3d Cir. 2011) .................................................................14

*McKenney v. Mangino*,
873 F.3d 75 (1st Cir. 2017)..............................................1, 15, 16, 17

*N.S. v. Kansas City Bd. of Police Comm'rs*,
143. S. Ct. 2422 (2023) (Sotomayor, J., dissenting)...........................18

*Plakas v. Drinski*,
19 F.3d 1143 (7th Cir. 1994) ...............................................................14

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000)................................................................................8

*Scott v. Henrich*,
39 F.3d 912 (9th Cir. 1994), *cert. denied*, 515 U.S. 1159 (1995) ......14

*Tennessee v. Garner*,
471 U.S. 1 (1985) .................................................................................... 16

*Tolan v. Cotton*,
572 U.S. 650 (2014) (per curiam) ............................................................ 7

*Velazquez-Garcia v. Horizon Lines of P.R.*,
473 F.3d 11 (1st Cir. 2007) ..................................................................... 8

*Woodman v. Haemonetics Corp.*,
51 F.3d 1087 (1st Cir. 1995) ................................................................... 9

**Other Authorities**

Federal Rule of Appellate Procedure 35(b) ................................................ 1

U.S. Const. amend. IV ...................................................... 2, 7, 14, 17

## RULE 35(b) STATEMENT

Rehearing en banc is warranted for three reasons:

*First*, the majority decision substantially deviates from longstanding Supreme Court and First Circuit summary judgment standards and disregards authoritative decisions applying those standards in use of force cases. The majority concluded that no reasonable jury could find that the officers used excessive force by weighing evidence, drawing inferences in the movants' favor, and making credibility determinations. The dissent's methodical analysis of the entire record highlights the majority's failure to apply basic summary judgment standards. Dissent at 57, 60-61, 65 n.32, 68, 70 n.34, 72 n.37, 78-84, 87 n.42. As the dissent determined, the record presents genuine, trial-worthy issues that a jury could rationally resolve in favor of either party. The majority assumed the role of the jury and essentially determined the dissenting judge was not acting as a reasonable juror, thereby injecting significant uncertainty into the proper application of summary judgment standards generally and in excessive use of force cases specifically.

*Second*, the majority decision disregards that, when circumstances change, officers must reassess the reasonableness of the use of deadly force. *Lachance v. Town of Charlton*, 990 F.3d 14, 25 (1st Cir. 2021); *McKenney v. Mangino*, 873 F.3d 75, 82 (1st Cir. 2017); *Jarrett v. Town of Yarmouth*, 331 F.3d 140, 149 (1st Cir. 2003); *compare* Majority at 32 (criticizing dissent for "separat[ing] the [fatal]

1

shooting" from earlier events) *with* Dissent at 79-80 n.40 (majority "overlook[ed] the immediacy requirement" by focusing on earlier events). The majority decision is now precedent for officers to use deadly force without assessing whether changing circumstances reduced the immediacy of a prior threat.

*Third*, this case raises questions of exceptional importance for police officers interpreting the constitutionality of the use of force, for courts assessing excessive force claims, and for whether victims of police violence have a meaningful right to trial in contested cases. The needs for clarity of analysis and certainty of result are paramount given the extreme circumstances here where police discharged 31 rounds into an incapacitated man within seconds. Without rehearing, the majority's errors will alter police-civilian interactions, create confusion about summary judgment and Fourth Amendment standards, diminish the import of precedent, and strip plaintiffs of the right to have a jury decide excessive force claims.

## **BACKGROUND**[1]

**1.     Officers Shot Root at BWH.**

On February 7, 2020, Godin[2] and another BPD officer (not a party here) responded to a call about a person with a gun near Brigham & Women's Hospital

---

[1] A complete recitation of the factual and procedural background is on pages 3-23 of Plaintiff's appeal brief filed on January 26, 2023 ("Pl. Br.").

[2] This petition refers to the individual defendants individually by their last names and collectively as "Defendants" and to Godin, McMenamy, Fernandes, Figueroa, and Thomas collectively as the "BPD Defendants."

2

("BWH"); they found Juston Root, who had gotten out of his car and was walking on the sidewalk. R.A. 39 (¶¶ 5-8, 11, 16). Godin pointed his firearm at Root, prompting Root to remove a clear plastic paintball gun from his waist. R.A. 40-46 (¶¶ 9, 16), 475 (01:25-01:35). Godin and the other officer fired at Root and believed they shot him. R.A. 40-41, 50, 67 (¶¶ 10, 12-13, 18, 130). Root limped to his car and drove away. R.A. 50 (¶¶ 17, 22).

## 2.    The Pursuit Was "as Slow as Molasses."

Godin drove after Root onto Huntington Avenue. R.A. 50 (¶¶ 22-24). Godin stated over BPD radio that Root had been shot, which the dispatcher repeated. R.A. 51 (¶¶ 25-26), 470 (01:15-01:19). During the pursuit, McMenamy "rammed" his cruiser into Root's car. R.A. 52-54 (¶¶ 37, 39-42, 45-46), 468 (02:59-03:05). McMenamy testified that when he did so, the pursuit was "noticeably slow" and "as slow as molasses." R.A. 52 (¶ 36), 468 (03:09-03:13), 2813.

## 3.    Defendants Killed Root.

The pursuit continued into Brookline until Root's car struck other vehicles and was extensively damaged. R.A. 56-57 (¶¶ 54, 56-64, 66). Root got out, limped around his car, fell onto the sidewalk, got up, staggered toward an adjacent mulched area, and fell again. R.A. 57-58 (¶¶ 67-72), 471 (00:22-00:54). Conneely "couldn't believe [Root] got out of" the car, and Figueroa assumed he was injured. R.A. 56 (¶¶ 58, 61).

Shelly McCarthy, an EMS-certified bystander, observed Root stumbling and holding his chest; she believed he might be having "a cardiac event." R.A. 58 (¶¶ 73-74), 432-433 (26:5-7, 29:20-22). She did not take her eyes off him; she ran to help and reached him as he fell the second time. R.A. 58 (¶¶ 75-76), 432, 434 (26:7-10, 34:1-6), 473 (video of McCarthy and Root at 00:27-00:30). According to McCarthy, Root appeared to be covered in blood; did not speak; "was struggling to breathe"; "gurgling blood"; appeared to have the "[l]ights on[,] no one home"; and his eyes were "bouncing around like ping-pong balls" until they rolled to the back of his head. R.A. 434-35 (34:12, 39:5-40:2), 58-59 (¶¶ 77-81). The entire time she saw Root, "his right hand remained on his chest," his left "remained hanging down," he did not try to get up, and could "absolutely not" have gotten up onto his feet. R.A. 59 (¶¶ 82-83).

Police began arriving, simultaneously screaming different unintelligible, "confus[ing]," and "chao[tic]" commands. R.A. 59-62 (¶¶ 84-100), 467 (00:29-00:38), 1439-40 (¶ 2). Root had no reaction. R.A. 437-48 (48:12-49:4). Root was— according to Defendants—"on the ground"; on his knees; sitting; "like in a half lying, half kneeling type of position"; "stumbling"; "lying, kneeling"; "never able to get up"; not fleeing; and did not get up or move. R.A. 60-61, 66, 68-70 (¶¶ 90-91, 120-121, 124-125, 134, 138-140, 148-150); Dissent at 80-81.

Within seconds of their arrival and only a couple seconds after McCarthy left Root, Defendants opened fire. R.A. 64-72 (¶¶ 110-159), 473 (00:28-00:43). Defendants proffered different reasons for firing: Figueroa and Conneely claim they thought they saw the handle of a gun; Fernandes and Thomas claim they heard a gunshot; Godin claims he heard another officer say the word "gun"; and McMenamy claims he saw Root stand up and open his jacket, "saw a floating gun in [Root's] chest," and saw Root "reach" in that direction. R.A. 65-71 (¶¶ 116, 122-123, 128, 134-135, 146-147, 154, 156). No other Defendant claims to have seen Root stand, and no Defendant saw a gun in Root's hand prior to shooting. R.A. 64-71 (¶¶ 111, 114-115, 120-121, 125, 129, 133, 138-141, 144-145, 148-150, 153, 157). While McCarthy observed Root clutching his chest with his right hand the entire time she saw him, Defendants could not see Root's hands, do not remember whether they could see his hands, or acknowledged that his right hand was in his chest area. R.A. 59, 64-70 (¶¶ 82, 112-115, 120, 123, 127, 133, 135-136, 141, 144, 153), 1439-40 (¶ 1).

After the shooting, Conneely told McMenamy to "shut your f*ckin' mouth" and asked if he had "a rep comin"; McMenamy replied, "I won't talk." R.A. 73-74 (¶¶ 174-175).

4.     **Root Was Not Holding the Plastic bb Gun.**

Root did not possess a firearm.  R.A. 76 (¶ 186).  An unloaded plastic bb gun with a metal rod extending from its barrel was recovered near Root's body.  R.A. 76 (¶ 182).  It was undamaged and did not have blood on it.  R.A. 76 (¶¶ 183-185).

Conneely claimed that when he rolled over Root's body after the shooting, he recovered the bb gun from Root's right hand.  R.A. 1556-57 (¶ 47), 361 (176:1-7).  This conflicts with (1) statements by Brookline police officers that when Root's body was rolled over, they both saw a gun fall from his chest area; and (2) Figueroa's testimony that nothing was in Root's right hand.  R.A. 150 (217:8-16), 1441 (¶¶ 8-9).

Four bullets struck Root's right hand, including one through his palm.  R.A. 74-76 (¶¶ 179-181), 1440 (¶¶ 3-4).  Plaintiff's forensic medical expert opined that if Root had the bb gun "in his [right] hand at the time that he was shot in Brookline, it would have had blood on it" and have been damaged.  R.A. 1440-41 (¶¶ 5-7).

5.     **The BPD Defendants Met Together Before Being Interviewed.**

The BPD Defendants' interviews with investigators were "taint[ed]" because they met together with their attorney to prepare to be interviewed by law enforcement investigators.  R.A. 77-78 (¶¶ 188, 192, 195), 590.  It was after the post-group-meeting interviews that the BPD Defendants first stated that Root was

supposedly reaching before the shooting.  Thomas—who did not recall whether he attended the meeting—was the only Defendant who did not claim to see Root reaching.  R.A. 68-70 (¶¶ 138-147).

## ARGUMENT

### 1.     The Majority Deviated from Summary Judgment Standards.

The majority failed to apply well-established summary judgment standards. *Tolan v. Cotton* is instructive.  572 U.S. 650, 659 (2014) (per curiam).  *Tolan* is a Fourth Amendment case where the Supreme Court reversed a grant of qualified immunity because the Fifth Circuit "clear[ly] misapprehen[ded]" summary judgment standards when it "credited the [movant's] evidence" and "failed to properly acknowledge key evidence offered by the" nonmovant.  *Id*.  The Court explained:

> [W]itnesses…come to th[e] case with their own perceptions, recollections, and even potential biases.  It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system.  By weighing the evidence and reaching factual inferences contrary to [plaintiff's] competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party.

*Id*. at 660.  The majority here misapprehended the same standards.  Just as the Fifth Circuit's decision warranted certiorari, the majority's decision warrants rehearing.

### A.     The Majority Failed to Apply Binding Precedent.

The majority violated the following summary judgment principles:

- The court cannot make credibility determinations or weigh evidence, and it must believe "[t]he evidence of the non-movant." [3] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

- The court must view "the entire record" "in the light most hospitable to the" non-movant and must make "all reasonable inferences in that party's favor." *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (court "give[s] credence to the evidence favoring the nonmovant" and "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses") (quotations and citation omitted).

- "[P]rovided that the nonmovant's deposition testimony sets forth specific facts, within his personal knowledge, that, if proven, would affect the outcome of the trial, the testimony must be accepted as true for purposes of summary judgment." *Velazquez-Garcia v. Horizon Lines of P.R.*, 473 F.3d 11, 18 (1st Cir. 2007).[4]

---

[3] Because Plaintiff appealed the grant of Defendants' and the City's summary judgment motions, R.A. 2814-15, she is the nonmovant for purposes of the appeal.

[4] The District Court misquoted *Velazquez-Garcia* by omitting "the nonmovant's" from the language quoted above. Pl. Br. at 44.

- "No credibility assessment may be resolved in" the movant's favor. *Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1091 (1st Cir. 1995).

*First*, the majority improperly accepted Defendants' statements and deposition testimony as true and discounted evidence undermining Defendants' claims. Majority at 11-19, 22-24. The majority also gave great weight to unsworn statements by Victor Gerbaudo, who was in his car on the opposite side of Route 9 during the shooting. Majority at 20-22, 36-37, 40. But, as the dissent noted, Gerbaudo's claim that Root turned to face the officers is "wholly inconsistent" with Defendants' statements, none of whom contend that Root turned before the shooting. Dissent at 71-72, 81.

*Second*, the majority drew inferences in the moving Defendants' favor while refusing to draw reasonable inferences in Plaintiff's favor. For example:

- The majority inferred that Root was "fleeing" from the scene in Brookline. Majority at 8, 33. This is contradicted by testimony from multiple Defendants that Root was not fleeing (R.A. 66-70 (¶¶ 121, 125, 134, 140, 149)) and surveillance footage showing Root limping from his car, falling flat onto the sidewalk, and stumbling into a mulched area where he fell again and remained until he died (R.A. 471-72).

- McCarthy testified extensively about Root's incapacitation the seconds before the shooting. *See* pp. 4-5 above. Plaintiff's expert opined that his "significant" blood loss "rendered [him] physically and mentally impaired"; that Root's right hand was shot four times, including through the palm; and if the bb gun was in Root's hand it would have had blood on it and would have been damaged. R.A. 1440-1441 (¶¶ 5-7), 1760. Yet the bb gun was undamaged and did not appear to have blood on it. R.A. 76 (¶¶ 183-184). Reasonable inferences are that Root did not reach inside his jacket, and Conneely falsely testified that he removed the bb gun from Root's right hand. But the majority declined to draw these because video "shows Root moving from his vehicle to the mulched area under his own power just seconds before [McCarthy] saw him." Majority at 37-38. That Root stumbled from his car to the mulch before collapsing does not make it unreasonable to conclude that he was later unable to reach inside his jacket.

- Although some Defendants told investigators that they demanded that Root "drop the gun," the audio from Figueroa's BWC recording does not support this claim, and no Defendant so claimed during their later depositions. R.A. 467 (00:29-00:38). The evidence is inconsistent as to whether anyone said "drop the gun," but the majority nonetheless

10

concluded that officers did. Majority at 3, 35. The majority also asserted that Figueroa's BWC "recorded an officer begin a command to Root to 'drop….'" Majority at 8. The recording is not so clear: there is an unidentifiable sound that gets cut off by gunfire. R.A. 467 (00:37). Whether any officer said "drop the gun" is a factual question for a jury.

- The majority inferred that because all Defendants used deadly force at about the same time, the force was reasonable. Majority at 42. That Defendants all fired for different reasons—including because two merely *heard gunfire*—reasonably implies that the shooting resulted from contagious fire. R.A. 1777 (121:13-22).

- The majority decided that "[a] reasonable officer *would* conclude that Root, known to be armed with a gun, *would* endanger the officers and nearby members of the public if not quickly apprehended," Majority at 34 (emphasis added), even though Defendants knew he had been shot, in a severe car accident, and was surrounded at least 6-to-1 in a confined area.

*Third*, the majority made credibility determinations through its repeated, conclusory assertions that Defendants' testimony was consistent (Majority at 11, 36-

11

37),[5] while dismissing concrete evidence undercutting Defendants' credibility, including:

- Conneely telling McMenamy to "shut [his] f*ckin' mouth," and McMenamy agreeing not to talk. R.A. 73-74 (¶¶ 174-175); Dissent at 68.

- Godin falsely claiming he was not wearing his BWC on February 7, while video footage revealed he was wearing it during the shooting, and an audit proved he had recorded videos on it that morning. R.A. 1448-59 (¶¶ 36-59); Dissent at 82-83.

- Conneely claiming he pulled the bb gun from Root's right hand while two Brookline officers reported that the bb gun fell from Root's chest area, and Figueroa testified that nothing was in Root's hands "at that moment." R.A. 1556-57 (¶ 47), 150 (217:8-16); Dissent at 67-68.

- The BPD Defendants (other than Thomas) collectively meeting with their attorney to prepare to be interviewed by investigators, which should raise credibility concerns because only Thomas did not testify that Root reached inside his jacket. R.A. 68-70 (¶¶ 138-147); Dissent at 68-69, 83.

---

[5] The dissent vehemently contests that the evidence the majority claimed is consistent is in fact consistent. *E.g.*, Dissent at 80-83.

In comparison to the majority's unquestioning acceptance of Defendants' self-serving statements and testimony, the majority wrote off McCarthy's testimony because, though she provided details about Root's physical condition, she had told investigators that she "didn't really get a good look at" Root's face.  Majority at 22-23.  The majority disregards that McCarthy also gave investigators several descriptions of her observations of Root's face, including that there were "lights on, [but] no one home"; his eyes were "pretty vacant"; and his expression did not change when police arrived.  Dissent at 70 n.24.  To the extent there are any inconsistencies in McCarthy's statements and testimony, those are for a jury to weigh, not the court.

*Finally*, the majority made unsupported factual determinations.  For instance, in rejecting Plaintiff's and the dissent's argument that Godin's failure to activate his BWC could harm his credibility, the majority incorrectly concluded that "there is no evidence that Officer Godin had a habit of failing to activate his body-worn camera." Majority at 42 n.22.  To the contrary, Godin repeatedly stated that he routinely left his BWC in his duty bag rather than wear it and activate it as required by BPD rules. R.A. 1148 (¶ 40), 1458 (¶ 54).  The majority also recited facts that do not appear in the record.  Majority at 4 n.1, 6 n.3.  For example, the majority implied that Huntington Avenue was crowded during the pursuit (*id*. at 6 n.3), but McMenamy testified that it was *not* crowded—"[t]here was no oncoming traffic," "no trolly," and "nobody around" (R.A. 263 at 123:21-124:3)—and surveillance footage shows

the same (R.A. 2813).  These unsupported facts  bolstered the majority's conclusion that Defendants' use of deadly force in Brookline was justified by earlier events in Boston.  This analysis is contrary to summary judgment and Fourth Amendment standards (Section 2 below).

### B.    The Majority Disregarded Authoritative Decisions.

The majority decision contravenes authoritative decisions in cases where police killed the other key witness.  Multiple circuits have warned that "[b]ecause 'the victim of the deadly force is unable to testify,'…a court ruling on summary judgment…'should be cautious…to ensure that officer[s are] not taking advantage of the fact that the witness most likely to contradict [their] story—the person shot dead—is unable to testify.'" *Lamont v. New Jersey*, 637 F.3d 177, 181–82 (3d Cir. 2011) (citation omitted); *Flythe v. District of Columbia*, 791 F.3d 13, 19 (D.C. Cir. 2015) ("[H]istory is usually written by those who survive to tell the tale…").  A "court may not simply accept…a self-serving account by the police officer" and "must…look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994), *cert. denied*, 515 U.S. 1159 (1995).  The court "critical[ly] assess[es]" the evidence and "decide[s] whether the officer's testimony could reasonably be rejected at a trial." *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir.

1994); *Flythe*, 791 F.3d at 21 (reversing summary judgment where "a reasonable juror [could] question [the officer's] personal credibility and his ability to observe, perceive, and recall the shooting").

Paradoxically, the majority dismissed these cases out of hand as "not circuit law—without identifying what this circuit's law is—while noting that "*Flythe* is entirely consistent with circuit law." Majority at 39, 41 n.21. By ignoring persuasive authority from multiple other circuits, the majority puts this Court out of step with its sister circuits.

***

The dissent systematically addresses infirmities in the majority opinion and concludes that there are material factual disputes that only a jury can resolve. Indeed, that the dissent identifies so many competing facts, inferences, and credibility issues indicates that there are substantial factual disputes about which reasonable jurors can disagree. The majority stood in the jury's shoes and conducted a one-sided evaluation of the evidence, which cries out for en banc review.

## 2. The Majority Ignored Blackletter Fourth Amendment Law.

"[T]he reasonableness of a use of force is to be determined 'at the moment' that force was applied." *Lachance*, 990 F.3d at 25 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)); *McKenney*, 873 F.3d at 81 ("Timing is critically important in assessing…reasonableness…."). Deadly force is reasonable "only" when a suspect

15

poses an "immediate threat." *Jarrett*, 331 F.3d at 149 (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). Officers must therefore reassess changing circumstances because, even if deadly force is "'reasonable at one moment,' [it] may 'become unreasonable in the next if the justification for the use of force has ceased.'" *McKenney*, 873 F.3d at 82 (citation omitted). When circumstances have "meaningfully changed," whether force is reasonable depends on those changes. *Lachance*, 990 F.3d at 25-26 (affirming use of "segmented approach" in analyzing applicability of qualified immunity to uses for force separated by "a change in circumstances").

The circumstances materially changed due to the gunshot wound(s) Root sustained at BWH and the car accident that was so catastrophic that Conneely was surprised Root got out of the car. McCarthy gave detailed, uncontradicted testimony about Root's precarious condition seconds before he was killed. Root's significant blood loss from the BWH shooting, the severity of the accident, and Root's resulting state are key components of the totality of the circumstances that Defendants were required to assess before shooting. Dissent at 79. But the majority split from this Court's precedent by relying on circumstances *before* the car accident to justify Defendants' use of deadly force *after*. The majority admitted this error: "any reasonable officer would have concluded that Root posed an immediate threat...*both before* and at the time of the fatal" shooting. Majority at 31 (emphasis added). The

majority then criticized the dissent for "separat[ing] the shooting in Brookline from the context of the morning's events," claiming that analysis was "inconsistent with" circuit law. Majority at 23-33. But the dissent analyzed the facts as *Lachance*, *McKenney*, and *Jarrett* instruct. The majority gave no explanation for why it relied on pre-accident circumstances and ignored the impacts of Root's blood loss and the car accident on the reasonableness of Defendants' conduct.

There is now a chasm in this circuit's law as to how police are to assess the totality of changing circumstances and how reviewing courts should interpret evidence concerning the (un)reasonableness of a use of force. En banc review is necessary to harmonize First Circuit law and ensure that the standards in prior cases are not diminished.

**3.　The Majority Decision Risks Future Fourth Amendment Violations.**

"'Specificity'" in Fourth Amendment jurisprudence "is especially important,' because it can be 'difficult for an officer to determine how the relevant legal doctrine,' such as excessive force, 'will apply to the factual situation the officer confronts.'" *Lachance*, 990 F.3d at 21 (quoting *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019)). The majority decision complicates, rather than simplifies, Fourth Amendment law and will impact how officers throughout the circuit respond to high-stress situations. Courts now may act as a factfinder at the summary judgment stage and accept police officers' testimony as true despite competing

evidence. This will deny plaintiffs a meaningful opportunity to have cases decided by juries. These wide-ranging consequences raise issues of exceptional importance that merit en banc review. *N.S. v. Kansas City Bd. of Police Comm'rs*, 143. S. Ct. 2422, 2423 (2023) (Sotomayor, J., dissenting) ("[Summary judgment standards] ensure[] that it is a jury that will hear evidence and determine which story is credible, not a judge reading a paper record. This role of the jury is particularly important in qualified immunity cases, where the stakes are not just about the parties involved, but whether there will be accountability when public officials violate the Constitution.").

## <u>CONCLUSION</u>

As addressed above, this Court should rehear this case en banc.

Dated:  May 6, 2024                    Respectfully submitted,

                                       Plaintiff-Appellant Jennifer Root Bannon,

                                       By her attorneys,

                                       */s/ Mark A. Berthiaume*
                                       Mark A. Berthiaume
                                          First Circuit Bar No. 20513
                                       Gary R. Greenberg
                                          First Circuit Bar No. 10957
                                       Alison T. Holdway
                                          First Circuit Bar No. 1197650
                                       GREENBERG TRAURIG, LLP
                                       One International Place, Suite 2000
                                       Boston, Massachusetts 02110
                                       Telephone: 617.310.6000
                                       Facsimile: 617.310.6001
                                       Email: berthiaumem@gtlaw.com
                                       Email: greenbergg@gtlaw.com
                                       Email: alison.holdway@gtlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on May 6, 2024, a copy of this document was electronically filed through the United States Court of Appeals for the First Circuit's CM/ECF system and that counsel of record will be served by the CM/ECF system.


*/s/ Mark A. Berthiaume*
Mark A. Berthiaume
First Circuit Bar No. 20513

## <u>RULE 32(g)(1) CERTIFICATION</u>

I hereby certify that:

1.      This petition complies with the word limit set by Fed. R. App. P. 35(b)(2)(A) because it contains 3,899 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f), as verified by the word count function of Microsoft Word, the word-processing system used to prepare this motion.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman size 14-point font.

*/s/ Mark A. Berthiaume*
Mark A. Berthiaume
First Circuit Bar No. 20513

21